**John HAMLIN et al., Appellants,**

v.

**Murry H. BRYANT, Appellee.**

**No. 185.**

Court of Civil Appeals of Texas.

Tyler.

Feb. 10, 1966.

Rehearing Denied March 3, 1966.

Earl Luna, Joseph M. Stuhl, Wise & Stuhl, Dallas, for appellants.

J. C. Muse, Jr., Ralph W. Currie, Muse, Currie & Kohen, Dallas, for appellee.

DUNAGAN, Chief Justice.

This suit is a contest over the will of Zeb Bailey Hamlin, a single man (never having been married) who died on October 26, 1960, at the age of 65 years leaving a duly executed written will dated August 3, 1959, on which the subscribing witnesses were E. O. Perry and J. D. Carney. This will is in evidence and on its face appears to be a valid will. His will left his estate, consisting of about 80 acres of land near Garland in Dallas County, to his nephew, Murry Bryant, the proponent in the trial court and appellee on appeal. The contestants, who are the appellants on appeal, are certain relatives of the deceased, Zeb Hamlin, being one brother, four sisters, three nephews and five nieces. One surviving sister (the mother of proponent-appellee Murry Bryant) did not join in the contest. Murray Bryant sought to probate the will in which he was named as the sole beneficiary. The other surviving heirs, with the exception of proponent's mother, contested this application.

The contest was based on four grounds: (a) lack of testamentary capacity; (b) deceased did not sign the will; (c) deceased did not execute the will with the requisite formalities; and, (d) in the alternative, if he did sign and execute the will, it was because of undue influence exerted upon him by proponent, Murry Bryant.

During the course of the trial, the contestants stipulated that the deceased had signed the will on both pages. Contestants also conceded that the will was executed with the formalities required by the statute.

The trial court submitted to the jury an issue on testamentary capacity which the jury answered in favor of proponent. Over the objection of proponent (that the evidence did not raise it) the trial court also submitted an issue on undue influence. The jury, being unable to agree, did not answer the issue on undue influence.

On motion for judgment, the trial court found that as a matter of law the evidence adduced in this cause did not and does not raise the issue of undue influence. That, therefore, Special Issue No. 2 inquiring about undue influence need not have been submitted and that the failure of the jury to answer said Special Issue No. 2 is immaterial to a proper determination of this cause and rendered judgment for the proponent. From this judgment the contestants-appellants duly perfected their appeal.

Under the Texas Rules of Civil Procedure, Rule 306a, judges must cause, and attorneys and clerks must use their efforts to cause, all judgments, decisions and orders of any kind to be reduced to writing and signed by the trial judge. The judgment appealed from, dated February 12, 1965, shows that it was signed by Freman E. Roberts, Judge,

52nd District Court sitting for Judge, 101st District Court, Dallas County, Texas.

■ The Honorable "Truman E. Roberts" and not "Freman E. Roberts" is the Judge of the 52nd Judicial District Court of this state. Judge Truman E. Roberts was serving in such capacity at the time of the trial of this case, including the date and entry of the judgment appealed from. These facts are judicially known to this court. Vol. 23, Tex.Jur.2d, page 42, Sec. 23; Mullins v. Mullins, 300 S.W.2d 133, (Tex.Civ. App.) 1957, n.w.h.; Strahan v. State, 85 Tex.Cr.R. 609, 221 S.W. 976; Porter v. State, 72 Tex.Cr.R. 71, 160 S.W. 1194. It is apparent that this is a typographical error made in transcribing the judgment.

Appellants' appeal is founded on 4 Points of Error. Their contentions are that the trial court erred: (1) in overruling contestants' motion for mistrial, based on the failure of the jury to answer Special Issue No. 2 pertaining to undue influence; (2) in ruling that there was no evidence of undue influence to justify the submission of Special Issue No. 2 thereon; (3) in overruling contestants' motion for instructed verdict which was based on the ground that there was no evidence to justify the submission of Special Issue No. 1 on testamentary capacity; and, (4) in overruling contestants' amended motion for new trial which was based on the ground that the answer to Special Issue No. 1 on testamentary capacity was against the great weight and preponderance of the evidence.

The facts adduced on the trial of this case show that in 1925 Zeb and his older brother, Steve, bought out the interest of their brothers and sisters in the old family home near Garland, Texas, and operated it together. Zeb never married. Steve did marry but became estranged from his wife and lived with Zeb for about 15 years, up until the time of Steve's death in 1958.

In July of 1958, Steve and Zeb executed a joint will in which each left his estate to the survivor. Steve died later that year, and this will was admitted to probate in 1958.

The will in question in the instant case was prepared by M. M. Priest, who is an attorney licensed to practice in Texas since 1926, and was engaged in the practice of law in Dallas, Texas, with her husband, Andrew Priest, during his lifetime. Andrew Priest died in 1962.

Mrs. M. M. Priest was called as a witness by the proponent and identified proponent's Exhibit No. 1 (which is the will that is being contested in this suit) as being the same instrument which she prepared for Zeb Hamlin at his request. She testified that she met Zeb Hamlin in July of 1959. The occasion for meeting him was that he had been sued. He was the defendant in a lawsuit and he had a citation in which an answer needed to be filed. The lawsuit in which he sought her representation was instituted by Steve Hamlin's widow, Belle Hamlin, against Zeb Hamlin, who was the executor under the joint will of Zeb and Steve.

She had conferences with Zeb Hamlin about this suit of Belle Hamlin's and talked to him about his property because it was involved in this lawsuit and he explained to her about where he got the property and the nature and extent of it. He said it had belonged to his mother and father and that they had died and left ten children and he had bought out the interest of the other eight children and had paid them around eight thousand and something dollars for their interest, and he and his brother, Steve, owned the property together. She checked the records to verify what he had told her about the property. He told her how she could locate the property and she drew a little diagram at the time from his description of it. He told her that he had been sued previously about this property and gave her the volume and page in the Southwestern Reporter where it could be found. She looked up the reference as to where he said the case was reported and found the information to be correct.

The suit brought by Steve's widow against Zeb Hamlin was ultimately settled by her firm. She said the settlement was made just a little while prior to Zeb's death. The notations in her file reflected that it was about the first of September, 1960.

She further testified that during the time she was handling the lawsuit wherein Steve's widow had sued him, he told her he wanted to make a will. He brought the matter up first. He said he and his brother had wills made to each other and after the brother died he wanted to make another will. He initiated the idea. That at the time he brought up the matter of executing a will and discussed it with her, no one else was in the office with him other than she.

She said she asked him to tell her how he wanted to divide the property. He said he didn't want to divide it. He wanted to keep it together; that he wanted to leave it all to Murry Bryant and the will should be so drawn. He said Murry Bryant was his nephew and she asked him if he had other brothers and sisters and nieces and nephews and he had a number of them. He said they didn't need it, didn't want it and they never did have any time for him and he wanted to leave it to Murry Bryant. He had a sister who sometimes came down and fixed his meals, but he said he had talked to her and she didn't want anything he had; she had plenty. That she and her husband didn't want anything so he wanted to leave it to Murry so it would be intact. The name of this sister was Mrs. Fannie Boyd.

She said Mr. Hamlin came into her office alone and Murry Bryant was not there. That at the time she didn't know Murry Bryant. Prior to the time she wrote this will, she did not have any conversation with anyone other than perhaps her husband or law partner and Mr. Hamlin himself, about the contents of this will.

After she finished getting instructions from him as to details, she drew up a simple will instructing him how to get it signed before witnesses who had known him for quite some time. She gave him these instructions orally. After the will was prepared, she mailed it to him.

She also testified that during the period of time she was representing Zeb Hamlin and dealing with him and up until the time that she wrote this will for him, she had conversations with him, sometimes by telephone, sometimes in person, but she would say a half a dozen or more occasions. She talked business with him on those occasions. These conferences lasted 30 minutes or longer. That during these conferences she had with him, she did observe his appearance and demeanor. As a result of those conferences and conversations and her observations of Mr. Hamlin, she did form an opinion as to Mr. Hamlin's mental condition at the time she wrote the will for him. She wrote this will about August 1, somewhere around the last of July or August 1 of 1959. She said she did have an opinion as to the mental condition of Zeb Hamlin on August 3, 1959, that being the date the will was executed. She talked to him on August 3, 1959. In her opinion Zeb Hamlin was of sound mind at all times. He was very emphatic; he was very definite in his opinions as to what he wanted. He knew exactly what he wanted and so expressed himself at all times. He did, in her opinion, have sufficient mental ability to understand the nature of the business of making a will. He did have sufficient mental ability to know the effect of making a will. He did have sufficient mental capacity to know who his relatives were. He did have sufficient mental ability to know who the natural objects of his bounty were. He had sufficient mental ability to understand the nature of any claim that any natural object of his bounty might have on him. He surely did know the general nature and extent of his property. He did know what he wanted to do with this property in his will. He had sufficient mental ability to hold all these things together at one time. She did not observe anything that would cause her to suspect that he was anything other than a man of sound mind. He was of sound mind.

On cross examination she testified that she first knew Murry Bryant sometime during the pendency of the Belle Hamlin lawsuit, sometime during the time they were making a settlement with her. As to Murry Bryant's purpose in being in her office in connection with the Belle Hamlin lawsuit, she said when they got down to the end of the settlement, she didn't know it to be a fact but she thought he (Zeb Hamlin) borrowed money to settle the suit from Murry Bryant.

She said Zeb Hamlin told her that Murry Bryant came to see him and helped him. He told her about trips that he had taken with Murry Bryant. As to whether some other person influenced Zeb and caused him to take the action he took on this will, she testified no one influenced him; that it was his own decision. He did not talk to anyone before he came to her office. He hadn't made the will at that time and he hadn't talked to anyone about it. She was asked how did she know this and she said because he (Zeb Hamlin) told her so. She said she asked him if he had discussed it with anyone—making the will—and he told her he had not discussed it with anyone.

Sometime before they settled this lawsuit in September of 1960, he (Zeb Hamlin) said he told Murry he had made a will and as a matter of fact he had given the will to Murry to put in his safety deposit box. Zeb Hamlin is the one who paid her for representing him in the lawsuit and who paid her to write the will.

She said that she did not know how he got to her office. If someone brought him, she didn't know. He came to her office by himself.

She did not represent Murry Bryant in any matter at all. She never represented him, other than the filing of this application to probate the will. After a contest developed and she thought she might be a witness in the case, she withdrew as counsel and advised Mr. Bryant to get other counsel.

To her knowledge he never did write a will later than the one she prepared. He never expressed any dissatisfaction with the will which she prepared. He said that is just exactly the way he wanted it, that's his words. She said she had no reason to believe that he ever revoked this will by another will.

J. D. Carney, one of the witnesses to the will, had been a resident of Garland, Texas, since 1930, a real estate broker in appraisal service since 1946, a director of the new Colonial National Bank in Garland, and a man 60 years of age at the time of the trial, testified: that Zeb Hamlin asked him to witness a will for him and he did so and identified proponent's Exhibit 1 (the will involved in this suit) as the will which he witnessed for him. That Mr. Hamlin called him four or five days before the day he witnessed the will and that Murry Bryant called him the day before in regard to him witnessing the will. He testified that the persons present when the will was signed were E. O. Perry, Zeb Hamlin, Murry Bryant and himself. He said Mr. Hamlin handed him the will and he took it and read it to himself and then read it out loud and asked Mr. Hamlin, "Is this the way you want this?" He replied that it was. Thereafter, Mr. Hamlin signed the will in his presence and in the presence of E. O. Perry. Then he and Mr. Perry both signed the will in front of each other and that he (Carney) handed the will to Mr. Hamlin. That Mr. Hamlin was present when he and Mr. Perry signed the will as witnesses. He further testified that he and Mr. Hamlin were friends and that he saw him occasionally at ball games and at different things, social activities in the Garland community. That Mr. Hamlin was very active. That during the year or year and a half prior to the signing of this will, he had seen Mr. Hamlin once a week or maybe more. That he did not talk to him on each of these occasions, but did have casual talk with him on some occasions. During the years he had known Mr. Hamlin and particularly during the later years, he did have an opportunity

to observe him. During those years he had an occasion to form an opinion as to his mental condition and that condition existed on the day he signed this will. He stated that in his opinion that Mr. Hamlin's mind was sound when he signed the will August 3, 1959, that he had sufficient mental ability to know the general nature of the property that he might own. That he had sufficient mental ability to know who his relatives were and had sufficient mental ability to know of any claim that any of his relatives might have against him if they had any. He did not notice anything that occurred on August 3, 1959, that would cause him to suspect that there was anything wrong with Mr. Hamlin's mind. That so far as he knew, Mr. Hamlin never did write a will later than this instrument of August 3, 1959. He also testified that he had known Murry Bryant for a good many years and may have played Dominoes with him at the domino hall.

Mr. E. O. Perry of Garland, Texas, the other witness to the will who was in the retail lumber business operating as Perry Lumber Company, which is the place where the execution of the will took place, testified that he was 51 years of age and knew Zeb Bailey Hamlin during his lifetime. That Hamlin asked him to witness the will for him and that he did witness such will for Hamlin. He identified the will being proponent's Exhibit No. 1 as the will which he witnessed for Mr. Hamlin. Those present when the execution of the will took place were Mr. Carney, Mr. Hamlin, Mr. Bryant and himself. That Mr. Carney took the will and read it to himself and out loud. He heard him read it. After he read it, he asked Mr. Hamlin if that was the way he wanted it and Mr. Hamlin answered and said that it was. That Zeb Hamlin then signed the will and he saw him sign it on both pages. Mr. Carney was present when Hamlin signed the will; that he saw Mr. Carney sign it and that he signed it. Mr. Hamlin was present when he signed it and Mr. Carney was present when he signed it.

Mr. Perry said at the time he witnessed the will, he had known Zeb Hamlin some twenty or twenty-five years. During that time he had occasion to converse with him quite often. Most of the time he would see him two or three times a week, maybe, more or less, and this had continued to some extent over the period of twenty or twenty-five years he had known him. As a result of his conversations with him and his observations of him extending over this period of time, he did form an opinion as to his mental condition as it existed on the day he signed the will. It was his opinion that he was of sound mind and he had sufficient mental ability to know the general nature of the property he owned, sufficient mental ability to know who his relatives were, and sufficient mental ability to know what he wanted done with his property when he died. That he never did observe anything about him that would indicate to him (Perry) that he (Zeb Hamlin) was anything other than a man of sound mind.

In addition to witnesses Priest, Carney and Perry, the following witnesses testified that Zeb Hamlin was of sound mind:

Delbert S. Todd, Vice-President, First National Bank in Garland, said he was of sound mind. That he had known Mr. Hamlin since 1945.

Cecil Sarver, who said he had known Mr. Hamlin for about 45 years, lived right across the road from him about 200 yards distance and in his opinion Mr. Hamlin was of sound mind on August 3, 1959, and at all other times. Mr. Sarver said during all the periods of time since 1951 up to the date of Mr. Hamlin's death, he had noted no difference in his mental condition.

Aubrey Skelton, who lived in Garland, testified that he had known Zeb Hamlin for about 18 years prior to his death. That he knew him real well. During the last several years he would have conversations with him quite often. And that this continued up until the time of his (Hamlin's) death. He stated in his opinion Mr. Hamlin was of sound mind and had sufficient

mental ability to know his property, his relatives, what he wanted to do with his property, who might have claims on him and to understand the effect of making a will. He said he had never observed anything that caused him to suspect that Hamlin was anything other than a person of sound mind.

Sharp Hartsfield, a resident of Garland, first met Zeb Hamlin in January, 1950, and said he knew him well. That he lived across the road from him and that they were very close neighbors. They played Dominoes together once a week. That it was in early 1951 when they began playing Dominoes. That they played every Monday night. The evidence shows that the will was executed on Monday; therefore, the witness Hartsfield played Dominoes with him on the very night of the day the will was executed. Witness Hartsfield testified that Mr. Hamlin's mind was sound. He had sufficient mental ability to know what property he owned, to make up his mind about what he wanted to do with it, to know his relatives, to realize the effect of making a will. He knew what he was doing. He never saw anything about Zeb Hamlin that would bring any question as to his mental soundness.

Mrs. Fannie Boyd, one of the contestants and the only contestant who saw the deceased every day, testified that in August, 1959, or shortly before then, or shortly after that, she noted nothing unusual about her brother Zeb. She was asked during the two or three months before the will was made whether she had noticed any difference in Zeb in regard to his health and memory, any different from that time and back before Steve's death. She answered: "No, sir, I didn't really notice any difference. Only, he didn't seem like *hisself*, but I thought that was because he was sick." When asked to explain what she meant by he didn't seem like himself: "Well, he just used to be always laughing and talking. He seemed like there was just something the matter with him. He would just sit around and didn't have much to say." In response to another question, she said: "Well, he just never did confide in me none like he always had. He never did talk things over with me like he used to. He just quit. He just quit talking about anything to me, any of the business affairs or anything he always talked to me about everything."

The contestant, Lou Hamlin Minor, stated with respect to her brother's mental condition: "No, I think his mind was all right." In response to the question: "You think his mind was all right?" she answered: "Yes, I think he was sick." She was also asked: "Was Mr. Zeb a man that was easily influenced?" She answered: "No, I don't reckon." Question: "You don't reckon he was?" Answer: "No." She was asked to describe any change in Zeb's conduct after Steve's death and her answer was: "Yes. Oh, yes. Well, he just seemed like he was forgetful." She said: "He wasn't well. He didn't seem happy. He didn't seem happy at all."

John Hamlin, another contestant, testified in response to the question whether in the month of August, 1959, he noticed anything unusual about his brother Zeb, he answered: "Well, nothing only that—the only thing that I noticed, I went down there and helped him on his tractor on different occasions, and he couldn't stoop over without just getting short of breath." He was asked: "Did you notice anything about his mind that was any different?" Answer: "No, I don't. No, sir, I didn't." He said he guessed Murry Bryant was pretty good to Zeb. Murry went out there and shaved Steve about once a week. He further stated that he couldn't say that he noticed anything unusual about the way his brother acted; that he carried on his business like he always had. He also testified that he was over Zeb's farm from time to time to help him with his equipment and to help him with his cotton. That after Steve's death, Zeb "was more irritable."

Laura Benningfield, another contestant, testified, with respect to her brother Zeb,

that he did make sense when he talked; was able to conduct his business affairs— "Didn't nobody do it for him that I know of." She was asked: "Now, directing your attention to the summer of 1959 in the month of August, did you notice your brother doing anything unusual at that time, your brother, Zeb?" Answer: "Well, he had been sick a long time. He had been sick when my other brother was sick. He was sick, too. He wasn't *hisself*. He hadn't been *hisself* in several years, just like he really used to be." Question: "Well, what did you notice that led you to—" Answer: "Well, he was short talking and short tempered. He never was like that. You know, you couldn't talk to him. You couldn't get close to him by talking to him. He just changed altogether." Question: "Did he make sense when he talked?" Answer: "Oh, yes, he made sense. He wasn't—wasn't like that. And he couldn't remember good, you know."

The contestant, Fannie Boyd, testified that for 13 years she did all the cooking and most of the housework for her two brothers, she was there at least once a day but usually twice a day. She would get to their house about "6:00 in the morning," would "fix their breakfast before they went to work" and then: "Well, I'd stay until I got the dishes washed and the house cleaned up, maybe cook a little something that was hard to cook and then come back and cook dinner and supper." She testified that Steve Hamlin had diabetes and required lots of care. After Steve became bedfast the last few months of his life, she "stayed there most of the time." She was not paid to do this work. That she did this because she lived closer to her two brothers than her other sisters. In her own words, she said she did it "because I was the only woman to." She also testified that in her opinion, Zeb Hamlin had diabetes. This was based on her experience in taking care of brother Steve who had diabetes.

The evidence is that the relationship between Zeb Hamlin and Murry Bryant was close and long standing. In this connection, proponent testified:

When I was about 4 or 5 years of age he (Zeb Hamlin) used to come and get me and I would spend two or three days and nights at a time with him. My feelings for my uncle Zeb were more like a daddy than an uncle. Uncle Zeb took an interest in my athletic career while I was in high school. He attended most of the games. I was on the baseball, football and basketball teams. I got out of high school in 1935, age 18. My uncle Zeb had an interest in dogs. I got my first greyhound from uncle Zeb. I trained dogs that he had on the race track. Zeb Hamlin was a man interested in dog races. We went together to dog races and he came to Massachusetts to visit me a couple of times when I was training his dogs up there. That was in 1936 or 1937, when I was 20 or 21 years of age.

When I was going to high school, anytime I needed money I would go to him. I got money from him every week or so. Later on, when I got grown, I would lend him money where he wouldn't have to go to the bank and pay interest on it. I did this on many occasions.

Contestant, Fannie Boyd, testified that during her visits to Zeb's home that she would see Murry Bryant around the place about every day. He and her brother appeared to be on friendly terms and in response to a question: "Would you say that Murry was good to your brother Zeb?" she answered: "Yes, sir, I guess so."

The testimony is undisputed that after the death of Steve Hamlin, none of the contestants (except Fannie Boyd) had much association with Zeb Hamlin, if any. Laura Benningfield stated that during the last year and a half of his life she never visited Zeb in his home. She saw him only at her sister's. John Hamlin admitted that after the spring of 1959, he did not visit Zeb "too often." He was there "a time or two during June, July and August."

Contestant Lou Minor last saw Zeb at Mrs. Boyd's home. She went over to Zeb's house early one morning with Mrs. Boyd about two weeks before Zeb died and helped Mrs. Boyd "clean up around some."

There is no testimony that any of the remaining ten contestants ever had any association with the testator (Zeb Hamlin) at all.

It is undisputed that Fannie Boyd was good to the testator, Zeb Hamlin. She did the housework for both Steve and Zeb and then, after Steve's death, continued to do the same thing for Zeb.

Moreover, the record reveals without dispute that the testator, Zeb Hamlin, was fully appreciative of the service rendered to him and Steve by Mrs. Boyd. After Steve's death (according to Mrs. Boyd's testimony) he told her that he had wanted Steve to will to her one-half of the property. Mrs. Boyd said she told Zeb she didn't want it.

So, when Zeb Hamlin informed his attorney, M. M. Priest, that Mrs. Boyd did not want anything, apparently he was merely repeating what Mrs. Boyd herself had told him.

The following questions were propounded to and answers given by Murry Bryant:

"Q Mr. Bryant, you took that will from the lumber yard?

"A I don't remember whether I took it that day, next week or the next, but my uncle gave it to me later.

"Q You had had it ever since?

"A He told me to lock it in the safety deposit box.

"Q And you didn't tell a soul about it until after he died?

"A He asked me not to.

"Q You didn't tell anybody about it, did you?

"A He asked me not to.

"Q You honored that request?

"A I sure did."

There was no medical testimony offered in this case insofar as the record before us reflects.

■ It seems that under the applicable law in a will contest case involving a claim of undue influence, the pertinent inquiry is what the facts and circumstances are relative to: (1) the making of the will; (2) the execution of the will; (3) the mental condition of the testator at the time the will was prepared and executed; (4) the physical condition of the testator at the time the will was prepared and executed; (5) the relationship between the testator and the proponent; and (6) the relationship between the testator and the contestants.

In presenting their plea that there is some evidence of undue influence in this case, the appellants rely strongly upon the case of Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1939.

The Supreme Court in Long v. Long, supra, stated:

"* * * Every case is different from every other case, and must depend largely on its own facts and circumstances. Generally speaking, undue influence is such influence or dominion as exercised at the time, under the facts and circumstances of the case, which destroys the free agency of the testator, and substitutes in the place thereof the will of another. Undue influence has also been defined as that dominion acquired by one person over the mind of another which prevents the latter from exercising his discretion, and which destroys his free agency. Also, undue influence has been defined as 'that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist.' * * *

"It cannot be said that every influence exerted by one person over the mind of another is undue. The influence is not undue unless the free agency of the testator has been destroyed, and a will produced that such testator did not desire to make. * * *

"In will cases, after mental capacity has been shown, the burden of proving undue influence is on the party contesting the probate of the will. Hart v. Hart, Tex.Civ.App., 110 S.W. 91.

"It is rarely possible to prove undue influence by what is generally known as direct testimony. * * * It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence. Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Bergstedt v. Bender, Tex.Com.App., 222 S.W. 547.

" * * *

"A person of sufficient mental capacity to make a will has a right to devise his property as he may see fit, so long as he transgresses no law. Also, a person in making a will rests under no legal obligation to devise his property according to the laws of descent and distribution, or according to any moral law, and the mere fact that a testator has ignored such laws is no ground for setting aside his will. In spite of this however, the fact that a testator has left a will that is unnatural in its terms, and makes a difference between those who, according to natural law, ought to stand equal as to his bounty, may be considered as a circumstance along with other circumstances in determining whether or not the will was a product of undue influence.

" * * *

" * * * Without going into details, we will say that there is evidence in this record which would justify the jury in finding that this will is unnatural in its terms, and makes a difference between those who, according to natural law, would stand equal as to Mrs. Long's bounty. Of course, this alone is no ground for rejecting a will. It is a mere circumstance to be considered along with other circumstances."

The Amarillo Court of Civil Appeals in the case of Burgess v. Sylvester, 177 S.W. 2d 271, said:

"Undue influence must be exercised at the time of making the will, and the will must result therefrom. Rounds v. Coleman, Tex.Civ.App., 189 S.W. 1086; Cloudt v. Hutcherson, Tex.Civ. App., 175 S.W.2d 643, 653.

"A will cannot be set aside on proof of facts which at most do no more than show an opportunity to exercise undue influence which may have existed or raise a bare suspicion that such influence may have been used. Rounds v. Coleman, supra, and authorities cited, page 1090 of 189 S.W. See, also, Cameron v. Houston Land & Trust Co., Tex.Civ.App., 175 S.W.2d 468, 470, and authorities there cited.

" * * *

"At this point we observe that the existence of an unnatural will alone does not establish undue influence. It is a circumstance to be considered but, standing alone, it is not sufficient to establish the ultimate fact. * * * "

The Supreme Court granted a writ of error in Burgess v. Sylvester, supra, and in its opinion affirming the judgment of the Court of Civil Appeals, reported in Volume 143 Tex. 25, 182 S.W.2d 358, said:

" * * * These facts simply, in our opinion, do not in any manner connect the Sylvesters with the making of this will or warrant the inference that same was made under the spell of their influence. A solemn will executed under the formalities required by law by one mentally capable of executing it should

not be set aside upon a bare suspicion of wrongdoing on the part of the beneficiary. We sustain the holding of the Court of Civil Appeals upon this point."

■ Where circumstantial evidence is relied upon to show undue influence, as in the case now before us, the circumstances must be of a reasonable, satisfactory and convincing character. In re Estate of Olsson, 344 S.W.2d 171 (Tex.Civ.App.) 1961, writ of error refused, n. r. e.

■ The "undue" influence which will vitiate a will must be exercised at the time of its making. Mason v. Mason, 369 S.W.2d 829 (Tex.Civ.App.) 1963, writ refused, n. r. e. and Besteiro v. Besteiro, 65 S.W.2d 759 (Tex.Com.App.).

It has been held that although a testator was under the general and even the controlling influence of another person in the conduct of his affairs, such will not suffice to invalidate a will on the ground of undue influence unless that influence was specially exerted upon the testamentary act. Likewise, it has been held that persuasion, argument and solicitation are permissible and cannot be considered undue influence unless these acts subvert and overthrow the will of the testator and cause him to do a thing he did not desire to do. Pullen v. Russ, 209 S.W.2d 630 (Tex.Civ. App.) 1948, writ refused, n. r. e.

It has also been held that one may request or even importune and entreat another to execute a favorable dispositive instrument, but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker they will not taint the validity of the instrument with undue influence. Curry v. Curry, 153 Tex. 421, 270 S.W.2d 208, 1954; Rothermel v. Duncan, 369 S.W.2d 917, Tex.1963.

The Supreme Court in the case of Curry v. Curry, supra, said:

"We attach no weight to the fact that the defendant secured the services of the notary and the attesting witnesses. * * * The mere act of arranging for a notary and witnesses does not give rise to a reasonable inference of undue influence."

The Supreme Court of this state in the case of Rothermel v. Duncan, supra, made this statement:

"* * * Thus, before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. * * *.

"The burden of proving undue influence is upon the party contesting its execution. It is, therefore, necessary for the contestant to introduce some tangible and satisfactory proof of the existence of each of the above stated elements of undue influence. * * *

"It cannot be said that every influence exerted by one person on the will of another is undue, for the influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will of the one exerting the influence. Long v. Long, supra. * * *"

In Boyer v. Pool, 154 Tex. 586, 280 S.W. 2d 564, 1955, it was said:

"* * * Proof that the daughters were favored and that the contestants got nothing under the will is not proof that the daughters did in fact substitute their mind and will for the mind and will of the testator. * * *"

■ While the cases all agree that undue influence can (and often must) be established by circumstantial evidence, however, the circumstances relied on as establishing

the elements of undue influence must be of a reasonably satisfactory and convincing character and they must not be equally consistent with the absence of the exercise of such influence. Winn v. Daniel, 386 S.W. 2d 293 (Tex.Civ.App.) 1965, writ refused, n. r. e.

 The evidence in this case shows Mr. Hamlin to be a man of strong character and one accustomed to conducting his own business. There is no evidence in the record before us, either direct or circumstantial, showing that Murry Bryant exercised or exerted any influence over Zeb Hamlin in any way that influenced his testamentary acts. There is no evidence of any specific act or thing that Murry Bryant did which induced Mr. Hamlin to make the will. At most, it is only shown that Bryant had the opportunity to exert influence upon Hamlin had he chosen to do so. This is not sufficient to show undue influence.

The exertion of influence that is "undue" cannot be inferred alone from opportunity, but there must be some evidence, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the execution of the testament itself. Rothermel v. Duncan, supra. There is no such evidence here. In our opinion the evidence in this case fails wholly to meet the test required of our courts and for these reasons, we overrule appellants' contentions raised in their Points of Error Nos. 1 and 2.

There remains to be considered and disposed of appellants' Points 3 and 4.

There can exist no doubt in this case about the sufficiency of the evidence to justify the submission of Special Issue No. 1 on testamentary capacity. The evidence was ample for the submission of said issue and to support the jury's answer thereto, and from the record as a whole not contrary to the great weight and preponderance of the evidence. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660. The testimony of the eleven witnesses concerning the mental condition of Zeb Hamlin, the testator, including all the contestants who testified was to the effect that he was of sound mind. Accordingly, appellants' Points 3 and 4 are overruled.

Judgment of the trial court affirmed.