**TAYLOR v. SMALL et al.**

**No. 7967.**

Court of Civil Appeals of Texas. Austin.

May 9, 1934.

Rehearing Denied May 23, 1934.

W. Marcus Weatherred, of Coleman, for appellant.

Baker & Baker, of Coleman, Callaway & Callaway, of Brownwood, and Critz & Woodward, of Coleman, for appellees.

BAUGH, Justice.

This is the second appeal of this case. The first appeal is reported in (Tex. Civ. App.) 54 S.W.(2d) 151. The same issues were submitted to the jury upon the second trial as upon the first. The suit was to deny probate of the last will of Mrs. Virginnie Taylor, deceased, on the grounds, first, that she was of unsound mind at the time she executed said will; and, second, that it was procured by the undue influence of Fred Taylor, his wife, and daughter. The jury found upon the second trial that she was of sound mind, but in favor of the contestants, appellees here, on the issue of undue influence; and the trial court denied probate of the will, from which judgment the proponents have appealed.

In view of the conclusion we have reached, a clearer understanding of the matter may be had by a chronological review of the facts and circumstances. Mrs. Virginnie Taylor was the mother of four children, viz. Mrs. Lillie Small, a widow, who lived in Oklahoma; F. Wall Taylor, who died many years prior to her death, and who left surviving him his widow, Mrs. Beulah Taylor, and four children, Mrs. Newsom, Mrs. Pirtle, Vivian Taylor, and Frank W. Taylor; Sam Taylor, who died many years ago, and who left surviving him one daughter, Mrs. Lula Witten. All of the above named were contestants of the will. The fourth and youngest child was Fred Taylor, the proponent of the will.

Prior to 1928, Mrs. Virginnie Taylor, possessed of a considerable estate, had been very bountiful in her gifts to all of her children, especially so in her declining years, and subsequent to 1920 Mrs. Lillie Small being especially favored in this respect. On December 22, 1927, she conveyed to Mrs. Small and Mrs. Beulah Taylor jointly 960 acres of land adjoining or near to the city of Coleman, which Mrs. Virginnie Taylor stated that she valued at $100 per acre. In June, 1928, she conveyed to her son Fred Taylor a business house in Coleman, and to his children certain lands in Concho county, Tex., reserving to herself a life estate therein and all revenue therefrom until her death. In July, 1928, Mrs. Lillie Small brought suit, as next friend for her mother, against Fred Taylor and his children to have said deeds set aside, alleging that Mrs. Virginnie Taylor

was, at the time of their execution and for several years had been, of unsound mind, and asked that a receiver be appointed by the court to take charge of all of her property, and that Fred Taylor be enjoined from exercising any control over it. A receiver was appointed, made bond in the sum of $20,000, on which all of the contestants, except Mrs. Pirtle, were sureties. That suit to set aside said deeds was tried four times in each of which Mrs. Virginnie Taylor testified at length. The first trial was on August 22, 1928, at which Mrs. Lillie Small, her daughter, and Mrs. Beulah Taylor, her daughter-in-law, both testified, in the presence of Mrs. Virginnie Taylor, that she was of unsound mind. Three days later, on August 25, 1928, the will in question was executed.

■ The circumstances surrounding the execution of the will were: On the morning of August 25th, Mrs. Taylor called her attorney, Mr. Weatherred, to come to her home to prepare her will. He went there, talked with her alone, made memoranda of her wishes, returned to his office, and prepared the will. Later in the day he returned to her home with J. P. McCord, and a neighboring lady was called as an additional witness. The will was read to her by Mr. Weatherred in the presence of the other witnesses. She stated that it was what she wanted, and executed it. There is no evidence that Fred Taylor or any of his family were present or had anything to do with it. The uncontroverted evidence is that Mrs. Taylor wanted Fred and his children to have the property devised. It was also clearly shown, and Mrs. Taylor so stated at the time, that her reason for not devising anything to Mrs. Small and to Mrs. Beulah Taylor and her children was that, after all that she had done for them, they had sworn that she was crazy, and had tried to take all of her property away from her. While appellees urgently insist that she never did comprehend the nature and import of the suit to set aside the deeds, and that she thought that Mrs. Small and Mrs. Beulah Taylor were seeking to take her property away from her and put her in the poorhouse, her attorney testified that he explained to her the nature and purpose of the suit, and that she knew that all of the contestants, save Mrs. Lula Witten, were acting jointly in seeking to have the deeds to Fred Taylor and his children canceled on the grounds of mental incapacity. Regardless of how fully she may have understood the significance of that proceeding, its purpose, that is, to preserve to her estate for their benefit the property conveyed, was obvious; and, if they succeeded, her property would have been taken from her control, and a guardian appointed. Those matters, however, clearly related to the issue of her mental capacity, on which the jury found against the contestants of the will, and only incidentally to the issue of undue influence. It was clearly their testimony that she was and had long been mentally unsound, when they had been the recipients of her bounty only a few months before, that she resented, and these facts, according to her own statements, prompted the execution of the will, providing only nominal bequests to Mrs. Small and to the children of Mrs. Beulah Taylor. She bequeathed to Mrs. Lula Witten, the only daughter of her other son, long since deceased, the sum of $5,000; but it was shown that Mrs. Witten, then about 45 years of age, had spent practically all of her life in other states and in Mexico, and had no occasion to receive the affectionate solicitation of the grandmother for her welfare.

On the other hand, Fred Taylor lived in Coleman, and had for many years been her chief adviser in the management and control of her estate in her old age. His family had evidently been kind to her. She trusted him and had confidence in his judgment. Many of the checks constituting her benefactions to the other children were signed by him as her agent. Her preferences for him and his family in her will in the light of the circumstances above set out were, we think, but natural and normal.

Most of the evidence contained in the voluminous statement of facts, consisting of 850 pages, relates to the issue of mental capacity. The jury found her to be of sound mind, as it did in the first trial. The evidence is ample to sustain that finding. While it clearly shows, we think, that because of her age (she being about 80 years old at the time) and her physical condition, she had grown forgetful in many things, had become childish in some respects, and possessed traits concomitant with declining years, her reactions to the ingratitude of her children, especially towards those who had been especially favored by her, were but natural and normal, and the will attacked was not, under the circumstances, an unnatural nor abnormal disposition of her property.

■ Other than evidence of weakened mental capacity of the testator and the opportunity of Fred Taylor and his family to exercise generally undue influence over Mrs.

Virginnie Taylor, the facts and circumstances relied upon by the contestants, appellees here, to sustain the jury finding of the undue influence charged are in the main as follows: The testimony of a Mrs. Williams that Mrs. Virginnie Taylor would want Mrs. Lillie Small, Mrs. Joe Brooks, the latter's daughter, and Mrs. Beulah Taylor to do things for her, but she did not want Fred's folks to know about it, because they would not like it. The testimony of Mrs. Joe Brooks that she would not go to testatrix' home when Fred's folks were there, because testatrix had asked her not to come then. Testimony of Mrs Beulah Taylor that at one time (just when is not shown) testatrix gave her $2 to take to Mrs Lula Witten, with the admonition that she not let Fred's folks know about it, because they would get mad every time testatrix gave her anything.

When viewed in the light of the undisputed facts, we think the foregoing constitutes no evidence whatever of undue influence over testatrix. It was not controverted that unkind feelings against Fred by Mrs. Joe Brooks, Mrs. Lillie Small and Mrs. Beulah Taylor existed at the time and that neither of them had spoken to Fred for perhaps several years. This estrangement between them, the causes of which were not shown, was undoubtedly known to Mrs. Virginnie Taylor, who had been kind to and generous with them all. In her declining years she doubtless desired to see peace and harmony prevail between her own children, and perfectly natural and normal would be the effort to avoid any conduct on her part that might embroil rather than allay the turbulent waters of filial discord. These little incidents therefore manifest on their face, we think, in the light of such conditions, a normal conscious effort on her part merely to "keep peace in her family," and nothing more, and constitute no evidence of any influence over her on the part of Fred Taylor and his family.

Another incident relied upon occurred in connection with the leasing for oil of 5½ sections of land in Schleicher county. Just when this incident occurred is not clear. Mrs. Brooks testified that it was about two years before the will was executed. The land in question had been conveyed by testatrix in 1922 to Fred Taylor, Mrs. Lillie Small, and Wal Taylor, before the latter's death. In December, 1926, Fred Taylor reconveyed to testatrix his one-third interest therein. But it is not clear whether testatrix owned a one-third interest in the land at the time in question or not. Fred Taylor brought a prospective lessee of the land to the home of his mother on the occasion in question, when Mrs. Joe Brooks, who represented her mother, Mrs. Lillie Small, and Mrs. Beulah Taylor (her husband, Wal Taylor, then being dead) were present. Fred, it seems, was in favor of leasing said land on the terms proposed. However, Mrs. Brooks and Mrs. Beulah Taylor were not interested, and Fred and the prospective lessee then left the house. After they had left, according to the testimony of Mrs. Beulah Taylor, testatrix "seemed awfully nervous, and said Fred would not like it because we were not interested; that it had put the oil man in an embarrassing position"; that testatrix said she would sign the lease; that "after they left she told me she would sign anything Fred wanted her to, to keep him from getting mad." Concerning this same incident, Mrs. Joe Brooks testified that "She (testatrix) said she would sign anything Fred wanted her to sign; if Fred wanted it signed, she would sign it."

The foregoing related to the oil lease. Mrs. Virginnie Taylor had never seen the land in Schleicher county and knew nothing about it. At that time Fred was aiding and assisting his mother, being her only surviving son and living in Coleman, in the management of her property, and on whose judgment she placed great reliance. Under such circumstances, we find nothing in said incident, which occurred some two years prior to the execution of the will, which even remotely indicates that Fred Taylor dominated his mother in the execution or terms of the will itself. There was no evidence that he requested the execution of the will, or had anything to do with it. On the contrary, the testimony of the witnesses to the will, of the attorney who drew it, and the circumstances of the trial three days before, the effect of which was reflected in the statement of testatrix herself at the time, clearly, we think, account for its execution and its terms.

While a weakened mind and opportunity to exercise undue influence over a testatrix may be considered by a jury on such issue, the influence, if it existed, must have operated at the time the will was executed, and must have so far controlled and subverted the mind of the testatrix as to render her unable to resist it, and that as a result the document speaks the mind of the beneficiary and not that of the testatrix. And as stated in Holmes v. Houston (Tex. Civ. App.) 241 S. W. 1039, 1051, cited by appellees, "In order, however, to establish the issue by such evi-

dence, the circumstances relied upon must be so connected and of such probative force as to lead a well-guarded mind to a reasonable conclusion that such influence was exercised prior to the execution of the testament, and that it operated upon and controlled the will power of the testatrix at the time of its execution."

The law is well settled in these respects and a prolonged discussion of it here would be superogatory. The subject is dealt with at length, and the cases reviewed in Drewry v. Armstrong (Tex. Civ. App.) 223 S. W. 281; Houston v. Holmes, supra; Stolle v. Kanetzky (Tex. Civ. App.) 259 S. W. 657; Idar v. Uehlinger (Tex. Civ. App.) 49 S.W.(2d) 998 (writ refused).

It is not an unusual occurrence for a jury, where unequal disposition of property between members of the family is made by will, sometimes to make their desire to do what they conceive to be justice between offspring of a parent, subordinate to the quantum of proof required to sustain their findings. However worthy such purpose may be, it cannot sustain a finding without sufficient probative evidence to support it. In such cases the courts have not hesitated to set such findings aside. The testimony adduced on the motion for a new trial in this case might lead to the conclusion that such purpose so influenced the jury in their findings on undue influence. That evidence showed that the first ballot of the jury on the issue as to whether proponents exercised such undue influence over testatrix, eight jurors voted that they did not and four that they did. Thereupon the result of such finding was discussed and statements made that, if the issue were answered "No," the will devising most of her estate to Fred Taylor and his family would stand. But that, if it were answered "Yes," the will would be stricken down and the estate descend to her children in equal portions. Thereafter the jury did answer the issue "Yes."

■ The courts have not been hesitant to place their stamp of disapproval upon attempts to nullify wills of aged persons, instigated by those who felt themselves inadequately remembered, on grounds of undue influence, unless there be some substantial evidence of probative value to warrant such a conclusion. Pierson v. Pierson (Tex. Civ. App.) 57 S.W.(2d) 633 (writ refused). It is not enough to show mere suspicions or disconnected circumstances. Those shown in the instant case in view of uncontroverted

facts and circumstances surrounding the execution of said will are, in our opinion, of no probative value on the issue raised. There is no indication that the evidence would be different upon another trial, and the controversies between the litigants has been amply prolonged. The judgment of the trial court is therefore reversed, and judgment here rendered admitting said will to probate.

Reversed and rendered.