Dora Pearl **MILLER** et vir, Appellants,

v.

Goldie Olean **FLYR** et vir, Appellees.

No. 7978.

Court of Civil Appeals of Texas.

Amarillo.

Oct. 27, 1969.

Rehearing Denied Nov. 24, 1969.

Buzzard & Comer, Ross N. Buzzard, Pampa, for appellants.

Gibson, Ochsner, Adkins, Harlan & Hankins, Sterling E. Kinney, Amarillo, for appellees.

NORTHCUTT, Justice.

This is a will contest between Goldie Olean Flyr, joined pro forma by her husband, and Dora Pearl Miller, joined pro forma by her husband, concerning the property of their deceased mother, Mrs. Dora L. Kenney. There were two wills involved. One will was dated July 19, 1966 and the other one dated August 29, 1967. The County Court admitted to probate the will dated July 19, 1966 and denied the probate of the will dated August 29, 1967. On appeal to the District Court the case was tried to a jury upon two issues. In answer to the two issues the jury found that the deceased, Dora L. Kenney, did not have testamentary capacity to make the will dated August 29, 1967 and that said will was the product of undue influence. Upon the verdict of the jury the District Court

denied probate of the will dated August 29, 1967 and ordered the will dated July 19, 1966 be probated. From that judgment Dora Pearl Miller, joined by her husband, perfected this appeal.

Dora L. Kenney was the sole owner of the property here involved. Mrs. Kenney had three children, namely Dora Pearl Miller, Goldie Olean Flyr and a son that is deceased. The son had two daughters, namely Dorothy Gertrude Keller and Geraldine Bayless. According to this record Mrs. Kenney had made two wills prior to the two wills here involved. On August 10, 1938, she executed her will and after making three gifts of $5.00 each she willed all the rest of her property to Dora Pearl Miller. After the 1938 will was executed two of the parties mentioned in the will that were given $5.00 each died and Mrs. Kenney executed another will dated November 5, 1951, in which she gave Goldie Olean Flyr $5.00 and $5.00 to each of her two granddaughters and the rest real, personal or mixed, to Dora Pearl Miller.

In the will dated July 19, 1966, Mrs. Kenney willed all of her rings to Goldie Olean Flyr; $10.00 in cash to each of her granddaughters, Dorothy Gertrude Keller and Geraldine Bayless, and all of the rest of her property of every nature to Goldie Olean Flyr and Dora Pearl Miller, share and share alike. Then in her final will, revoking all other wills, dated August 29, 1967, she willed to her daughter, Goldie Olean Flyr, the sum of $10.00 and each of the granddaughters the sum of $10.00 and willed all the rest of her property real, personal or mixed which she might own at her death to her daughter, Dora Pearl Miller, in fee simple. Hereinafter, Dora Pearl Miller and husband will be referred to as appellants and Goldie Olean Flyr and husband as appellees.

The real issue here involved is whether there is any evidence of probative value to sustain the findings of the jury that testatrix did not have testamentary capacity on August 29, 1967 or that the will dated on that date was procured by undue influence. If Dora L. Kenney was of sound mind and possessed sufficient capacity to make a will and said will was not procured by undue influence, the will dated August 29, 1967, being her last will and revoking all other wills, should be the will probated. The appellees in contesting this will because Mrs. Kenney lacked necessary testamentary capacity to make a will and because of undue influence pleaded as follows, to wit:

"A. On the 29th day of August, 1967, the alleged day of execution of the writing, DORA L. KENNEY lacked the necessary testamentary capacity to sign the writing because she was not of sound mind and did not possess sufficient capacity to make a Will.

B. The writing was originally executed while the decedent, DORA L. KENNEY, was in a state of ill health and persons whose names are unknown to this applicant at the time exercised over the decedent and over her mind and will, such influences or dominion as to prevent the Will from being DORA L. KENNEY'S own free will, but instead constituted the will of the unnamed person or persons who exercised such undue influence."

It is to be noticed in this case that appellees do not plead that Mrs. Miller exerted such influence over Mrs. Kenney as to cause her to execute the will as she did, but pled appelles do not know who exerted such influence upon Mrs. Kenney. We are familiar with the rule that where a testator leaves a will that is unnatural in its terms and makes a difference between those who according to natural law ought to stand equal as to his bounty, may be considered as circumstances along with other circumstances in determining whether or not the will was a product of undue influence.

It was a Mr. Emmert, an old friend of Mrs. Kenney, that recommended Mr.

Broughton to Mrs. Kenney. Mrs. Kenney and Mrs. Miller went to Childress to have the will drawn. Mr. Broughton was the attorney drawing the August 1967 will and he testified in part as follows:

"Q. Would you state your name, please?

A. C. C. Broughton.

Q. And how old a man are you, Mr. Broughton?

A. Sixty-five.

Q. What is your occupation or profession, please?

A. Attorney.

Q. Where do you live?

A. Childress.

Q. Where do you practice?

A. Childress, and in that area.

Q. How long have you been a member of the Bar?

A. Forty-one years.

Q. Are you a member of the Texas Bar Association?

A. That is correct.

Q. Any other legal associations?

A. American Bar and District Bar and so forth.

Q. All right. Are you associated with a firm there, please?

A. Yes, sir.

Q. What is the name of your firm?

A. Williams, Broughton and Forbis.

Q. What is the full name of the senior member there, please?

A. C. A. Williams.

Q. And then the third lawyer?

A. John T. Forbis.

Q. Has Mr. Forbis ever held any public job down in your area?

A. He has been District Attorney there.

Q. Did I ask you how long you have practiced in Childress?

A. I believe you did. Yes, sir.

Q. What was your answer?

A. Forty-one years.

Q. Forty-one years?

A. Since 1927.

Q. Mr. Broughton, did you ever meet Dora Kenney?

A. Yes, sir.

Q. When did you meet her?

A. August of 1927, I believe the latter part of August.

Q. · Okay.

A. And—what did I say, '27—'67.

Q. Okay.

A. I am still thinking of when I started practicing.

Q. Okay. Now, when she came to your office, was anybody with her?

A. Her daughter was with her.

Q. Now, what happened? Did somebody make some introductions or did you ask—what happened at that point, please?

A. It seems to me that I had been called about an appointment or—I am not certain, but I believe I had; in other words, when Mrs. Kenney came in my private office, her daughter, Mrs. Miller, was with her, and she stated that her mother had had, was having trouble seeing. I believe she had some surgery on an eye, and she wanted to help her find a chair. And she started to seat her in a chair across from the desk, and there was a chair kind of at the end of the desk closer, and she was an elderly person. And I didn't know whether her hearing was good or not, so I asked that she be seated closer, and she did. And the daughter left the office.

Q. Then what did Mrs. Kenney have to say to you, please?

A. She wanted me to prepare a Will.

Q. All right. And did you talk to her then about how she wanted the Will made?

A. I did.

Q. And did she identify to you the people that she wanted identified in the Will?

A. That is correct.

Q. What did she have to say about those people, please?

A. Well, she had some papers with her, Abstracts or Deeds, things of that nature. She wanted to know if I would need those papers that had the description of her properties, and I told her, well, I didn't know, until I knew what type Will she wanted to make. If she was going to leave certain property to certain persons, I would need a description, but if it was all to go alike, that I would not need the description. And then she explained to me what she wanted in her Will.

Q. Now, in the Will she names a number of people. There are a lot of names in the Will—

A. I beg your pardon?

Q. There appears in this Will dated August 27, 1967, a number of names.

A. Yes, sir.

Q. Where did you get those names, please?

A. From Mrs. Kenney. She is the only person that ever discussed the Will with me.

Q. Where did you get the spelling of the names, please?

A. Mrs. Mrs. Kenney."

* * * * * *

"Q. (By Mr. Buzzard) Mr. Broughton, I will hand you an instrument identified as Proponent's Exhibit 1, and I will ask you to—if that Will was signed in your presence?

A. Yes, sir.

Q. Is that Dora L. Kenney's signature that appears thereon?

A. That is correct.

Q. Does your signature appear thereon, please, sir?

A. As a witness, yes.

Q. And who was the other witness?

A. C. A. Williams."

* * * * * *

"Q. That is all right. I will just ask if at that time you and Mr. Williams were above the age of fourteen years old?

A. That is correct.

Q. How old is Mr. Williams, please?

A. Oh, Mr. Williams was at that time eighty, I guess.

Q. And how old do you think Mrs. Kenney was on that date?

A. Well, at that time, I judged her to be in her seventies. I have learned later that she was actually some older than I thought she was.

Q. What appearing woman was she? Was she old and feeble and talked with a weak voice, or how did she appear?

A. No.

Q. Just explain her appearance?

A. Actually, I just had the impression she was probably in her seventies, maybe early seventies or mid-seventies, but I have learned later that she was some older than that. Her voice was strong. There wasn't anything to indicate feebleness on her part.

Q. Was she gray and white?

A. I don't recall—you mean with reference to her hair?

Q. Yes, hair and face.

A. I don't recall whether it was or not. That is the only time I have seen—

Q. (Interrupting) Now, she signed that in the presence of you and Mr. Williams?

A. That is correct.

Q. And you signed it in her presence?

A. That is correct.

Q. Did she tell you why she wanted to make a Will where she favored one daughter over the other, please?

A. Yes.

Q. What did she say?

A. It was because she just didn't like her son-in-law.

Q. Did she name her son-in-law?

A. She did.

Q. And what did she say about the son-in-law specifically?

A. Well, she said she didn't trust him, and that if she left his wife anything, he would get it, and that she had rather trust her sister to take care of her if she needed it than to trust her husband.

Q. Her sister meaning who, please?

A. Mrs. Miller.

Q. Who is the son-in-law, please. What is his name?

A. Flyr.

Q. Do you know his first name?

A. No, I don't recall. She might have stated at that time.

Q. All right. Do you recall what she said about trusting the older girl to take care of her younger sister? Can you remember anything specific, or was that just it?

A. Well, I can't photo word for word. The best I remember is that she just gave

that as the reason, and she detailed some things, some experiences she had had with her son-in-law, and said that if she left that daughter anything, that this son-in-law would get it, and she didn't want him to have it. And said if Mrs. Flyr needed anything she would rather trust her other daughter, Mrs. Miller, to take care of her than to trust her husband.

Q. Did she say anything about any other Wills that she had had in the past?

A. Yes.

Q. What did she say, please?"

* * * * * *

"A. She said that she had made—well, I know she mentioned two other Wills. She said she had a Will that left the property similar to the Will she wanted me to prepare, and that since she had made it, then she had made another Will in which she made a different disposition of the property, and said that she had never been satisfied with the one she made last. That was last up to the time this one was prepared. And she wanted to put it back like it was in the first Will.

Q. Did she say anything to you as to whether or not she expected this Will to be contested?

A. Well, when she told me what she wanted to do, I told her that I wanted to go into the matter with her very thoroughly to determine if that was her desire, because Wills of that character, being what we usually term an unnatural Will, were quite frequently contested, and she said, if Flyr has anything to do with it, it will be contested.

Q. Now, was Mrs. Miller in your office at the time the Will was being discussed?

A. No, sir.

Q. Did you read the Will after it was prepared?

A. Yes, sir.

Q. Did you read it to her or to both of them, or how did that take place?

A. After the Will was prepared, and I had time to read it over myself, I called Mrs. Kenney back in the office and asked her if she wanted to read the Will or if she wanted me to read it to her. The matter about her eyes had been mentioned, and she asked that I read it to her, and I told her, well, we will read it, and we will explain each paragraph as we go along. And I read it to her and explained each paragraph, and then asked her if she had any questions. I don't recall now whether she had any questions about it or not, but she said that was what she wanted, that was what she wanted, and—

Q. (Interrupting) I will pass—go ahead; excuse me?

A. All right. Then she said she wanted Mrs. Miller—wanted me to read the Will for her to hear it, so she was called in the office and the Will was read again. And as I recall, about the only remarks that were made while Mrs. Miller was in the office, Mrs. Miller said something about, said, 'Mamma, don't you want to say where that property is to go when I die?' And she said, 'No. I am just going to leave that up to you.' And then Mrs. Miller said, 'Well, it is your property. You can do what you want to with it'. And then she left the office, and went back out into the waiting room."

\* \* \* \* \* \*

"Q. Did you form any opinion about her state of mind before the Will was executed?

A. Certainly.

Q. And what is your opinion? Was she of unsound mind—

A. No, sir—

Q. Or sound mind?

A. I didn't see anything wrong with her mind, or I wouldn't have let her signed that Will."

Mr. Williams, a partner of Mr. Broughton who witnessed Mrs. Kenney's will, testified in part as follows:

"Q. What is your occupation or profession, please, sir?

A. I'm an attorney at law.

Q. Do you belong to any Bar Associations or professional societies of any kind, please, sir?

A. Yes, sir.

Q. What?

A. I belong to the Texas State Bar Association, The American Bar Association, The American Judicature Society, and our local Bar Association, The 100th Judicial District.

Q. Are you practicing law at this time?

A. Yes, sir.

Q. And do you have a firm?

A. Yes, sir.

Q. What is the name of your firm?

A. Williams, Broughton and Forbis.

Q. Where do you live?

A. I live at Childress.

Q. Is your firm located there?

A. Yes, sir.

Q. How many years have you practiced law?

A. I started the practice of law about January of 1911.

Q. How many years have you practiced law at Childress, Texas?

A. Well, all of that time, with the exception of three years I was in Wichita Falls, in 1920, '21 and '22.

Q. There is some evidence in this case that a Dora Kenney, herself eighty-one years of age, went to your office to make a Will and was waited

on by Mr. Broughton. Did you see Mrs. Kenney on that occasion?

A. Did I see a Mrs. Kenney?

Q. Yes, on that occasion?

A. Yes, I did.

Q. And would you narrate, please, what she said to you and what you said to her and so forth?

A. Mrs. Kenney and her daughter, who I believe was Mrs. Miller, came into our office one morning. I believe it was August the 27th. It was the latter part of August, 1967. Mrs. Kenney desired to see Mr. Broughton about making a Will. They went in Mr. Broughton's office, and I didn't see Mrs. Kenney or Mrs. Miller either as for that, until after the Will had been dictated. My office is to the back of of our suite of offices. And I walked up to the front of the office to the reception room, and the secretary who was typing the Will told me that Mrs. Kenney had had a cataract operation. Well, I had previously had a cataract operation and with that lead and introduction, whether she introduced me to Mrs. Kenney or not, I don't know, but I knew who she was from her being there in the office, and we had a visit for quite sometime. She was sitting there, and our discussion primarily was with reference to our experiences in eye trouble and cataract operations and results obtained. My operation had been some years back. And she was particularly interested in knowing how I had progressed and what trouble I was having, and how good my vision was at the time. And we also discussed where the operation was had, I believe, and perhaps the doctor, and matters of that kind. But our visit was primarily with reference to our experiences in eye surgery.

Q. Did she say anything that was illogical or just didn't make sense, anything senseless, anything like that?

A. No, I didn't notice it, Mr. Buzzard; if she did, it wasn't apparent.

Q. As you look back on it, do you think she evidenced any signs of infirm mind?

A. No. Her age was about the same as mine, and I'm not as fresh and alert as I was at thirty years old, perhaps the average person, but I observed nothing that would indicate that she was of an infirm mind.

Q. And do you think then that this lady you were talking to was a person of sound mind?

A. Yes, sir."

The undisputed record shows that Mrs. Flyr and Mrs. Kenney lived at Shamrock but that Mrs. Miller lived at Happy. Mrs. Flyr was with Mrs. Kenney every day but Mrs. Miller lived away from Shamrock and did not get to visit with her mother very often. The record is replete with evidence to show that Mrs. Kenney was a person of strong will, knew about all her property and children, and the record clearly shows how determined she was that Mr. Flyr should never have a chance to have any say as to her property. Mrs. Flyr was called as a witness in her own behalf and testified as follows:

"Q. Would you state your name, please?

A. Goldie Olean Flyr.

Q. Where do you live?

A. East of Shamrock, about six miles approximately.

Q. Do you recall a conversation with your sister, Pearl, in the month of March, 1968?

A. I sure do.

Q. Where did this conversation take place?

A. In Amarillo at the hospital.

Q. What was the date of the conversation?

A. Let's see, Mother passed away on the 7th, is that right, March the 7th—it was March the 6th.

Q. Were only you and Pearl present?

A. No. There were others there.

Q. What kind of a room was this in?

A. Well, it is just a big waiting room for the intensive care patient's relatives.

Q. Were you two alone in your conversation?

A. Yes.

Q. And what was the conversation, please?

A. Well, she says, 'Goldie, we are both women and we are both grown women, and we are big enough to take this, thought it would be hard'. 'But' she says, 'it doesn't matter how the Will reads or anything, we will split her down fifty-fifty. It will be ours, and we will do as we want to, and we will split her fifty-fifty.' "

This would seem to have a bearing upon why Mrs. Kenney felt she had rather trust Mrs. Miller in seeing that appellee was cared for than to leave her property where Mr. Flyr might get it, especially since there was substantial evidence that Mrs. Kenney often stated Mr. Flyr would never have anything she had.

Mrs. Hall, Mrs. Kenney's next door neighbor, testified that Mrs. Kenney could not say enough hard things against Mr. Flyr and that she told her Mrs. Miller had helped her make everything she had, but that Mrs. Flyr did not help her any. There is considerable evidence that Mrs. Kenney, in her later years, often became emotional and would often cry but this condition seemed to always be because of the condition of her eyes as she was going blind and could not see. Mrs. Kenney had given Mrs. Flyr $15,000.00 and made her use it to pay off the mortgage on her home and buy an automobile. We think this record clearly shows that Mrs. Kenney was trying to do her best to see that Mrs. Flyr was to be cared for by fixing her will so that Mr. Flyr could never have a chance to get any of it in his possession.

Appellees pleaded both mental incapacity and undue influence, and evidence was introduced in an effort to support both grounds. We are unable to find in this record any evidence other than Mrs. Miller went to Childress with Mrs. Kenney when she had the will drawn to even suggest that there might be any undue influence. Mrs. Kenney, after giving Mr. Broughton all the information as to how she wanted the will and after he had written it and explained each paragraph to her, said that was the way she wanted it. After that will was executed, there is testimony by disinterested witnesses that she stated that she had the property fixed as she wanted it.

 A will may be set aside for legal causes. A will may not be set aside because it is not the will some interested person or some jury might think the testator should have made. We are asked to find that there is evidence to support the jury's finding that Mrs. Kenney was unduly influenced in the execution of her will. Who is it claimed under this record or when and how such undue influence was exerted that influenced Mrs. Kenney? There is no evidence in this record that Mrs. Kenney was influenced by anyone to execute the will as she did unless it be the fact that Mrs. Miller took her to the attorney that drew the will. Mrs. Miller was not present when Mrs. Kenney gave the information to the lawyer and told him how she wanted the will drawn. The fact that Mrs.

Miller accompanied Mrs. Kenney leaves nothing but opportunity alone to prove undue influence, and the law is well settled that mere opportunity to do so is no proof whatever that undue influence has actually been exerted. Bethel et ux. v. Yearwood et al., Tex.Civ.App., 142 S.W.2d 927 (writ dismissed; judgment correct); Rothermel v. Duncan, 369 S.W.2d 917 (Sup.Ct.). Even conceding, therefore, that the evidence justifies the inference that there was an opportunity coupled with motive on the part of Mrs. Miller to exercise an influence over the testatrix, there is an entire absence of evidence indicating that any attempt was made so to do, nor does the simple fact that Mrs. Miller accompanied the testatrix to the attorney's office when she directed the preparation of said will and executed the same afford legal grounds for finding that it was a product of undue influence. Undue influence which will vitiate a will must be exercised at the time of its making. Hamlin v. Bryant, Tex.Civ.App., 399 S.W.2d 572 (n.r.e.); Mason v. Mason, Tex.Civ.App., 369 S.W.2d 829 (n.r.e.); Besteiro v. Besteiro, 65 S.W.2d 759 (Comm.App.).

We do not believe there is any evidence of probative force to sustain the finding of the jury as to undue influence. The only question that remains is did Mrs. Kenney have sufficient mental capacity to make the will dated August 29, 1967? As evidence that she did not, the appellees introduced several witnesses who, after stating some facts about Mrs. Kenney's eccentricities and weak mind, gave it as their opinion that she did not at the time of making the will understand what she was doing. Many of these, however, admitted on cross-examination facts which destroyed the evidentiary value of their opinions. Some of them even corroborated the conclusions of the subscribing witnesses as to her mental capacity.

Testamentary capacity is generally defined as the ability to know and understand the business in which the testatrix is engaged, the effect of the action of making the will, the capacity to know the objects of her bounty, and the claims upon her, and the general nature and extent of her property. It is stated in the case of Lee v. Lee, 424 S.W.2d 609 by the Supreme Court as follows:

"The Court of Civil Appeals extensively reviewed the evidence. The evidence in behalf of proponent shows that testator came unaccompanied to the office of scrivener, Earl Fitts, Esq., some few days prior to the execution of the will, and designated to Fitts the proposed disposition of his property. Testator returned after the will had been drafted, again unaccompanied, and executed it. As noted above the will contained a self-proving clause and the two witnesses and the notary, all longtime acquaintances of testator, testified that he was of sound mind when he executed the will. This testimony is however, not conclusive on the issue of testamentary capacity. See In re Price's Estate, 375 S.W.2d 900 (Tex.Sup.1964). The jury chose not to believe the testimony of the attesting witnesses and returned a verdict of 'unsound mind.' In this context we are presented with but one question: was there any evidence of probative value that J. W. Lee, Sr., was mentally incapacitated on October 2, 1961, the day he executed his will. It is fundamental that in answering this question the Court 'consider only the evidence which when viewed in its most favorable light, tends to support such a finding, and must disregard all evidence that would lead to a contrary conclusion.' Lindley v. Lindley, 384 S.W.2d 676, 679 (Tex.Sup.1964).; See In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951)."

The question here to be determined is, was there any evidence of probative value that Mrs. Kenney was mentally incapacitated on August 29, 1967, the day she executed her will? Mr. Hardin testified that in his opinion Mrs. Kenney was not capable of taking care of her property. He was asked if he would say that a per-

son would be taking care of their business if they entered their income and the sources of it in a register and then showed the expenses. He answered as if that was done but he did not believe Mrs. Kenney did that. This record shows clearly that she kept right on down to during 1967 a record of her income and her expenses. As to her taxes, she would show state and county tax so much setting down the amount and the same as to school taxes. On August 18, 1967, she entered in her records that she gave the rent house to Mrs. Flyr. Mr. Flyr testified he told Mrs. Flyr not to accept as a gift the rent house and that he had the instrument describing the deal they had transferring the rent house to Mrs. Flyr. This instrument was dated August 19, 1967 and signed by Mrs. Kenney and also Mrs. Flyr. This instrument was executed just ten days before the will of August 29, 1967. It shows Mr. and Mrs. Flyr here dealt with the testatrix as a person. They did not question her mental capacity to execute that instrument.

Mr. Broughton, the attorney drawing the August 29, 1967 will, did not know Mrs. Kenney before she came to his office to have the will drawn. She gave him all the information as to names and how to spell them and how she wanted the will drawn. She further told him about other wills she had written but was not satisfied with them. He explained to her about it being an unnatural will and that it might be contested. She told the attorney that if Mr. Flyr had anything to do with it it would be contested. After drawing the will he read it over to her and explained each paragraph to her. She assured him that that was what she wanted. She then signed the will before two attorneys that had practiced for many years. It is stated in Barton v. Bailey, 202 S.W.2d 277 (n.r.e.) as follows:

"As bearing upon the testator's capacity to make a will, the real test is whether at the time he knew what he was about, whether he knew what property he owned, the objects of his bounty and understood the general effect of his will. 44 Tex.Jur. 558, 559, Sec. 17; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292 (error dismissed).

'The propounded instrument is sustained as a general rule where the evidence shows that the decedent personally instructed the draftsman as to its preparation;' 44 Tex.Jur. 601, Sec. 59; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292, 'and the case of the proponent is strengthened by the circumstance that the decedent was alone with the draftsman, the proponent or beneficiary not being present.' McKenzie v. Grant, Tex. Civ.App., 93 S.W.2d 1160; Taylor v. Small, Tex.Civ.App., 71 S.W.2d 895. 'In favor of the proponent's case, it is to be considered that the draftsman was the decedent's attorney, and that the witnesses were honorable and competent persons.' McKenzie v. Grant, and Taylor v. Small, supra.

'Where it is shown that the execution of the writing was supervised by a lawyer, much probative force attaches to his opinion that the instrument expressed the wishes of the decedent.' 44 Tex. Jur. 601, 602, Sec. 59; In re Bartels' Estate, Tex.Civ.App., 164 S.W. 859 (Writ Ref.)."

It is stated in Green v. Dickson, 208 S.W.2d 119 (n.r.e.) as follows:

"It is the right of every citizen of this State to dispose of his property by will as he may desire, regardless of the ties of nature or relationship.

It is the established rule that, in determining whether an aged testator has sufficient mental capacity to make a valid will, the court should be controlled by testator's acts connected with the execution of the will, the reasonableness of its provisions, and his ability to detail the nature and extent of his property and to know the objects of his bounty.

'The test is not whether the person who has made testamentary disposition

of his property was of a high order of intelligence, but the humbler test is applied, Did he know what he was doing with the property which he knew he owned when he executed his will, and did he perform the act of his own free volition, and because he desired to do so?' Salinas v. Garcia, Tex.Civ.App., 135 S.W. 588, 590."

We are of the opinion, and so hold, that there is no evidence of probative force to sustain the findings of the jury that Dora L. Kenney did not have testamentary capacity at the time she signed the instrument of August 29, 1967, but that the evidence clearly shows she had testamentary capacity to execute said will. We further hold there was no evidence of probative force to sustain the findings of the jury that the instrument of August 29, 1967 was procured by undue influence.

■ Since this case has been fully developed, and we are of the opinion that the record clearly shows that testatrix had testamentary capacity, and that the will was not procured by undue influence, we think the case should be reversed and rendered instead of reversing for another trial. In other words, we are of the opinion there is no evidence of probative force of lack of testamentary capacity or that there was any undue influence to sustain the verdict of the jury; and believe that the evidence herein provided no reasonable basis for opposite conclusions by ordinary minds.

If necessary, we would also sustain the points of appellants that the verdict of the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust.

The judgment of the trial court is reversed and judgment is here rendered that the appellees-contestants take nothing by this contest and that the will dated August 29, 1967 be probated. Reversed and rendered.