**Herman Devoe WRIGHT et ux., Appellants,**

v.

**Carlton E. WOLTERS et al., Appellees.**

**No. 8123.**

Court of Civil Appeals of Texas, Beaumont.

Jan. 18, 1979.

Motion for Rehearing Overruled Feb. 15, 1979.

R. L. Miller, Gonzales, for appellants.

Wayne J. Prosperi, Houston, for appellees.

CLAYTON, Justice.

This is a contest of the will of Quentin Bryan Schaefer, deceased, filed for probate by the appellants (proponents) Herman Devoe Wright and his wife, Leta Bates Wright. The probate of the will was contested by appellees, who were brothers, sisters, two nephews, and a niece of the testator, upon grounds of testamentary capacity and undue influence. Upon submission of special issues to the jury on these two contested grounds, the jury returned a verdict on both issues against the appellants, and the trial court entered its order denying probate of the will.

The first four points urged by appellants are that the findings of the jury as to the testator's lack of testamentary capacity and undue influence "has no evidence to support it" and is so "greatly against the weight of the credible testimony as to be manifestly unjust."

Schaefer, the testator, was born in 1901, attended Texas A & M University, and graduated as an engineer. Upon his graduation he went to work for a company in Dallas engaged in the manufacture of x-ray and other medical equipment. He became vice-president of the company in charge of sales and retired in 1959. He was married once. His wife died in 1962, and he never remarried. After his retirement from the Dallas company, Schaefer, together with others, formed a new company known as the X-Ray Engineering Company, and later a second company called the X-Ray Equipment Company in Fort Worth. Following his wife's death, Schaefer spent a considerable amount of time visiting among relatives, but he remained active in the x-ray business until 1960, when he went on an advisory basis only.

In 1967, Schaefer moved onto a tract of land, part of which was owned jointly by him and his brother, and part of which was owned by Schaefer individually, and he lived on this farm until 1973. In April 1973, Schaefer, having difficulty in talking and subsequently in breathing, was taken to a hospital in Houston where he was diagnosed as having cancer of the larynx. He underwent surgery for the removal of his larynx.

Following the surgery, he was transferred to the Christian Home for the Aged. In June 1975, he was transferred back to the hospital, subsequently went into a coma, and died on July 8, 1975.

The will in question was executed by testator on the 21st day of August 1970, approximately five years before his death and two and a half years prior to his hospitalization. The will was drawn and signed in the office of E. A. Arnim, an attorney who had practiced law for nearly fifty years in Fayette County. Judge Arnim testified that testator brought in a will written entirely in the handwriting of the testator to be checked out, typed, and executed. Testator came into his attorney's office alone. This attorney had represented the testator in many transactions prior to the drawing of the will, including the settlement of his wife's estate, and the two had been friends for many years. The testator had executed a prior will in 1967 which was revoked by his 1970 will. Upon being questioned by the witness Arnim as to the reasons for making this new will, testator replied that his relatives would simply sell his land which he wanted preserved, that he wanted to keep his land together and eventually go to the daughter of appellants. He was very fond of the daughter. The 1970 will was typed out in virtually the same form as the handwritten copy brought in by the testator. Upon being notified the will was ready, testator came in, and on the 21st day of August 1970 the will was signed by the testator with Arnim and Arnim's secretary as witnesses; the notary duties on the self-proving affidavit were performed by another secretary of Arnim. All three testified as to the formalities of execution of the will and to the elements of testamentary capacity of testator, that on the date of signing of the 1970 will, testator was of sound mind.

Appellants (proponents of the will) were the sole beneficiaries under the terms of the will. They had been close friends with testator since 1937. Appellant Wright and testator had worked together for the same company many years. After testator had moved to the farm in Schulenburg, appellants moved their trailer up to testator's farm in 1966 or 1967. Testator executed a deed to 6.93 acres of land upon which appellants located their trailer and lived there, in close friendly relationship with testator. Testator was very fond of their daughter.

During the period of time at least two years prior to the execution of the 1970 will until he entered the hospital in 1973, the testator was engaged in a variety of businesses and social activities. During this time, he handled his Schulenburg farm on which he lived, doing such farm work as

feeding his cattle, doing routine maintenance work on farm machinery, and mowing weeds with his tractor.

Prior to 1968, he was in partnership with contestant's witness Kruse. He made a new arrangement for operating his Shiner farm with the witness Gerdes, and in 1970 another arrangement was made with Gerdes's son for operating the Shiner farm.

In 1967, testator made a lease contract with the witness Cain on some rental property owned by him in Dallas, and this lease was again negotiated in 1970 with a supplemental agreement. Shortly after executing the will in 1970, testator placed his home in Dallas on the market, listing the property with a long-time friend, and, after a series of negotiations, the property was sold in 1971. In 1969, testator purchased a new truck; the following year he bought a tractor. In 1970, he was considered as the "foreman" of the job of raising the elevation of a dam on his farm.

During these years, he was making frequent trips to Dallas, driving his own car and sometimes taking with him his nephew, a disabled war veteran, who was a ward of one of the contestants, for treatment in the Veteran's Hospital. During this time, testator was buying farm supplies as well as personal items and paying for them by check or cash. As one witness stated, "He was making his own deposit slips and neatly balancing his checkbook each month. He was keeping neat records of his farm income and expenses, furnishing his income tax data to his tax accountant and signing his tax returns." A witness testified as to testator's skill and versatility with his tools. Shortly before executing the 1970 will, the testator completed a short course on welding and afterwards used and practiced such activity.

Testator entertained guests in his home, including some of the contestants, who were visiting with him the month before the execution of the 1970 will.

The testimony was very lengthy, consisting of approximately 2,400 pages in the Statement of Facts from approximately fifty witnesses. Appellants presented numerous witnesses testifying that at the time of the execution of the will in question testator was of sound mind. Such conclusion was also given by the niece of the testator.

Appellants discharged their burden of proof in such manner, and it then became the burden of contestants to destroy the prima facie case made by appellants (proponents).

To show lack of testamentary capacity on the part of testator, contestants presented testimony from witnesses as follows:

Witness Bucek testified that testator came into Bucek's restaurant frequently; that in 1969 testator began to shuffle his feet when walking; his clothing and outward appearance was shabby; that he would get radical and irrational, and, based upon this, witness testified that testator was of unsound mind. Witness states that if testator left a will of this kind he had gone out of his mind. The basis of witness's opinion as to unsound mind was testator's radical reaction to things, such as the way he talked about how bad his food was, how bad the employees were, and how bad Texas A & M athletic program was. The witness admitted that testator knew the property he owned and that he could recognize his nearest of kin.

Witness Joe Schwartz testified that testator shuffled his feet, appeared sick, and it was difficult to understand what testator said. Based upon this observation, witness considered testator to be "mentally weak."

Witness Clyde Haynes testified that testator was an intelligent man until he reached a point where he "didn't remember" and had a pretty clear mind "until he started forgetting;" that testator began to "scuffle" his feet; that while in the hospital in 1973 testator wrote letters indicating he thought he was in Schulenburg when in fact he was in a hospital in Houston.

Witness Juanita Schaefer recalls an incident in 1967 when testator became angry with her; she observed a change in the way he walked; he began to shuffle his feet in his later years; his manner of speech changed and he mumbled most of the time;

he was forgetful. In the later '60's his outward appearance changed; that on one occasion the witness and two others were watching a parade, and testator walked by with a radio playing loudly and when asked to turn it down, he cursed her.

Raymond Kruse recalled that on two occasions testator did not recognize him; testator changed the way he walked in the ten years he knew him; he began to repeat himself; his appearance changed; he would become emotional when talking about the loss of his wife; he would make suggestions as to how to conduct the cattle business operated by witness and testator which were unworkable and that testator would use bad judgment.

Mylla Wolters testified that she had known testator since 1969; whenever testator visited in her home he would speak about other members of his family, his friends, and his cattle business; that she began receiving letters referred to as the "Q-lix" letters in which testator talked about visits to other countries in his "Q-lix" machine.

Witness Vickery, who was testator's tax accountant, stated that the testator considered the "Q-lix" letters as a joke, that the witness joked with him about taking trips in the machine and that they both considered this was a joke. The medical witness Dr. Fields testified that (referring to the letters) "That doesn't seem to be rational to me. I think that is about all the commenting I have." Vickery also testified that he had not noticed any change in testator's walking; that he walked like he might have had an arch problem or flat feet. He testified that testator was of sound mind and that he had the mental capacity to know and understand the nature and extent of his property, and to know who his relatives were and his next of kin and that on August 21, 1970, he knew the effect of his acts of making a will.

Other witnesses testified along the same lines as the witnesses heretofore referred to with reference to testator's mumbling, shuffling of feet, and his outward appearance.

Dr. Frank Bastian, a neuropathologist, testified that he made a neurological examination of the brain tissue of the testator which was made several months after testator's death in 1975 and five years after the making of his will. He testified that he diagnosed testator as having Creutzfeldt-Jakob disease (hereinafter referred to as Jakob's disease). He did not know how long testator had the disease. He testified that in most cases death from such disease occurs some three to twenty-four months from the onset of the disease.

Dr. William Fields confirmed Dr. Bastian's diagnosis of Jakob's disease, which is a very rare disease. The witness had only seen six to seven patients with such disease during the entire period of his medical practice. He states that the disease, in the early stages, starts at the frontal part of the cortex of the brain which relates to a person's judgment, memory, and thought processes. It then gradually spreads over other parts of the brain, affecting walk, and people with this disease have a tendency to shuffle their feet. Once the physical symptoms of the disease become apparent, such as shuffling gait, jibberish, shortness of memory, radical personality or behavioral changes, the disease is obviously present in the brain, including the cortex, and that this would impair his ability to reason, his judgment process and intellect. However, he testified that a lapse of memory would not be an indication of Jakob's disease. He further stated that a medical record (which was in evidence) stating "during the testing, patient had no difficulty following complex written or verbal instructions" indicates to him (the witness) that the patient (testator) had a certain mental capacity and that such results show that it was not typical of Jakob's disease. Most of the witness's testimony concerned itself with symptoms of the disease and what act could be consistent with such disease. He states that a man with Jakob's disease could be sensible one day and not all right the next, except for the very late stages; that on the day of the execution of the will, "he could have been having a good day." Dr. Fields

did not testify as to the severity of the disease at or preceding the execution of the will. He testified that he had never known the testator and had never seen him or treated him. All he knew about the testator were the things which he had been told by others. Based upon those matters, he concluded as to the making of the 1970 will, "I can only conclude by 1970 he [testator] would have had great difficulty in remembering things sufficiently well to have executed such an instrument in detail." We note here that the only detail in the will was the clause giving all his property to the proponents. Dr. Fields also indicated that the testator probably knew that he owned his bank account and that he probably knew that he owned his stocks and bonds as well as his other properties. The doctor further testified that radical surgery and removal of the larynx could have caused a sudden change resulting in stress that could have made his condition worse; that the cancer necessitating the removal of the larynx would have interfered with testator's breathing and would affect his speech. He testified that based upon the presence of Jakob's disease, "We would have to say he was of unsound mind."

The witness Dr. Braden testified that testator underwent surgery in 1973 for cancer and removal of his larynx. After this surgery, testator had pronounced generalized failure in his health. He was later hospitalized and grew progressively worse and died one month later; that cancer was the cause of his death; that at the time he first examined testator he was of sound mind. "He was a sick man. He was acutely ill. He was grasping for breath, but from a medical standpoint I feel he was normal." He stated unequivocally that testator was of sound mind. From the time of testator's first admission in 1973 until his second admission in 1975, testator had shown evidence of mental deterioration in addition to general physical deterioration.

■ Testamentary capacity is generally defined as the ability to know and understand the business in which the testator is engaged, the effect of the action of making

his will, the capacity to know the objects of his bounty, and the claims upon him and the general nature and extent of his property. See *Hamill v. Brashear*, 513 S.W.2d 602 (Tex.Civ.App.—Amarillo 1974, writ ref'd n. r. e.); *Miller v. Flyr*, 447 S.W.2d 195 (Tex. Civ.App.—Amarillo 1969, writ ref'd n. r. e.).

Our Supreme Court in *Lee v. Lee*, 424 S.W.2d 609 (Tex.1968), states:

"The proper inquiry in a will contest on the ground of testamentary incapacity is the condition of the testator's mind on the day the will was executed. Since there is no direct testimony in the record of acts, demeanor or condition indicating that testator lacked testamentary capacity . . . [date of execution of will], testator's mental condition on that date may be determined from lay opinion testimony based upon the witnesses' observations of testator's conduct either prior or subsequent to the execution [citing cases]. However, only that evidence of incompetency at other times has probative force which demonstrates that that condition persists and 'has some probability of being the same condition which obtained at the time of the wills making. * * *' 1 McCormick & Ray, Texas Law of Evidence, § 896, at 675 (2nd ed. 1956); Annot. 168 A.L.R. 969 (1947)."

In the case of *Bell v. Bell*, 237 S.W.2d 688 (Tex.Civ.App.—Amarillo 1951, no writ), the court reversed a judgment based on the verdict of the jury as to lack of testamentary capacity stating:

" 'A testator may be old and infirm, weakened in energy and impaired in his senses, but, if he responds to the test which is applied to human beings in the ordinary affairs of life, the disposition of his property will be respected. "It is not for juries nor courts to say how property should be passed by will. They can do no more than see that the testator's mentality meets the law's tests." ' "

In the case of *Stolle v. Kanetzky*, 259 S.W. 657 (Tex.Civ.App.—Austin 1924, writ dism'd), the court in reversing and rendering a judgment annulling a will states:

" . . . It is true that some of the acts testified to may establish the fact that the deceased was a mean man, or a criminal, or uncouth and coarse, or that he would disregard his contract, or that he did acts in a jocular manner under circumstances that it was not wise to do so, but in no way are they sufficient as a matter of law to establish insanity."

The testimony in the record before us concerns itself with symptoms of a disease; yet the testimony as to the severity of the disease on the date of the execution of the will is very weak and vague. We find competent testimony showing that on the date of the execution of the will in question, the testator was carrying on the normal activities of his life; that he knew and understood the business in which he was engaged, the effect of the action of making his will; and that he had the capacity to know the objects of his bounty, the claims upon him, and the general nature and extent of his property. The evidence of incompetency loses its strength when we examine it against the standard of the definition as stated in the court's charge, and the legal tests as laid down in the cases cited.

We overrule appellants' no evidence point, but hold that the finding of the jury as to the lack of testamentary capacity is so greatly against the overwhelming weight of the evidence as to be manifestly unjust.

As to appellants' points under "undue influence," we will not recite or detail the evidence in the record attempting to prove the element of undue influence.

In an "undue influence" case, contestants have the burden of proving: (1) the existence and exertion of an influence; (2) the effect of the operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the will; and (3) the execution of a will which the maker thereof would not have executed but for such influence. Because a contestant has the burden of proving undue influence, he must introduce some tangible and satisfactory proof of the existence of each of the above elements. *In re Estate of*

*Woods,* 542 S.W.2d 845, 847 (Tex.1976); *Rothermel v. Duncan,* 369 S.W.2d 917, 922 (Tex.1963).

We have carefully reviewed the entire record before us, and we find and hold that as to the three elements of undue influence stated above, the finding of the jury as to undue influence is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.

The judgment of the trial court is reversed, and the cause is remanded.

REVERSED and REMANDED.